TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042

410-964-0300

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311

201-342-6665

September 28, 2018

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

BY ECF AND HAND

Re: United States v. Patricia Adams
17 Cr. 636 (KAM)

Dear Judge Matsumoto:

Defendant Patricia Adams ("Adams") respectfully submits this letter as a Sentencing Memorandum for the Court's consideration in determining her appropriate and reasonable sentence. Defendant does not object to the United States Sentencing Guidelines ("Guidelines") calculation set forth in the Presentence Investigation Report ("PSR"). However, she does respectfully object to a few factual allegations within the PSR. For all of the reasons set forth in detail below, Adams respectfully submits that a sentence at the bottom of the applicable Guidelines range is sufficient, but not greater than necessary, to satisfy the sentencing goals set forth in 18 U.S.C. § 3553.

## PERSONAL BACKGROUND

Patricia Adams is sixty years old and has no criminal record. She is a life-long resident of Howard Beach, Queens. Through her work as the voice behind the Forum newspaper, Adams has advocated on behalf of the members of the communities the newspaper covers, the neighborhoods of Howard Beach, Ozone Park, Broad Channel, Richmond Hill and Woodhaven, by exposing corruption, informing of dangerous conditions, questioning insufficient governmental response, assisting local law enforcement and helping locate missing persons. Personally, Adams has volunteered countless hours to numerous causes and charities in the community she serves. Adams and her paper were leaders in South Queens' recovery from the devastation of Hurricane Sandy. This deep commitment to community is only surpassed by Adams' dedication to her family and friends. She is the bedrock of her family. Defendant's conduct in this case is

an aberration in a life that was, and is, dedicated to serving and assisting others.

In her letter to the Court,[1] Adams acknowledges that her current predicament is not "anyone's fault but my own." She likewise recognizes that "the sense of judgement on which I prided myself over the course of my life was absent" and that "clearly in this instance, I did the wrong thing." Accepting full responsibility for her action, defendant tells the court, "[I] own up to the responsibility of my actions on Mother's Day last year. I offer you no excuses, because there are none." Adams is also genuinely remorseful for all the harm she has caused. Her sister, Maryann Geary, informs the Court in her letter of support[2], "She made a mistake, one for which she has told me how sorry she is." Dr. Alvin Hershfeld, her doctor for over twenty-five years, observed that defendant "has been under my care throughout this ordeal and I have seen the toll it has taken, both mentally and physically. She has beaten herself up over it more than most would ever think of doing." Adams' domestic partner, Theresa Gulino, tells the Court, "I think I know better than anyone else how sorry Pat is and more than that how ashamed she is of herself for making a bad decision and for hurting anyone in the process" and that she demonstrates genuine and "tremendous remorse." Most importantly, defendant writes, "Above all, I apologize to the woman who has been put in the middle of this situation, for any and all pain she has suffered as a result of my actions." To accept responsibility for hurting her, or anyone else, is truly what make me more ashamed of myself than of anything in my life."

As the many letters of support and the petition[3] that are attached to this memorandum confirm, Adams enjoyed a reputation in the community for integrity and good works. However, defendant knows that her actions in this case have tarnished that hard-earned reputation. Because of her criminal conduct, Adams states, "While I accept total responsibility for what I did I am so ashamed of the fact this escape from judgment has caused so much hurt and devastation to my family, my friends and my community. I think of little else other than how I can ever earn their trust and respect back after this disgrace."

Adams summarizes her life's mission by stating, "I am a community journalist. And for more than twenty years, I have lived, worked and strived to make my community better, whether for the greater good or to help organizations and individuals." Many of the individuals that Adams has helped throughout her life have taken the time to submit letters of support to the Court. [redacted], a friend of over fifteen years, tells the Court that when he discovered a lump on his body, he called Adams for help. She immediately contacted one of her relatives that worked at Sloan Kettering Hospital to help find the right doctor. After [redacted] was unable to get an appointment with this doctor, "Pat got on the phone with her niece and we sat together and waited for a call back. An hour later, we were given an appointment for two days later." Unfortunately, [redacted] was diagnosed with late stage lymphoma. The doctor Adams had found for him placed him in clinical trial that required chemo injunctions to the spine without anesthesia. [redacted] writes, "It was agonizing. But sitting right at the end of the table

[1] Defendant's letter to the Court is attached as Exhibit A.
[2] All letters of support from family, friend and members of the community are attached collectively as Exhibit B.
[3] The petition is attached as Exhibit C.

looking at me and wiping sweat from the pain off my face was Pat Adams." He further writes, "She was with our family every day. Setting up medications, always comforting my children, keeping [my wife] strong." In reflection, tells the Court, "As a family we could never forget what she did and it is something that will live with us forever."



This account is not singular. , who recently passed away, prepared a letter to the Court before her death.[4] She wanted to write this letter even though Adams conveyed to her "that she didn't want to bother me and that I had enough on my plate to deal with. And that is just one example of how she has, for the last thirty plus years of our acquaintance, constantly shown that other people always come first." further writes, "When she learned I had cancer, she immediately set to work to find ways of helping me. When I was given the option of entering a clinical trial, she went over every detail of it." When blood pressure could not be controlled, "[Adams] put together menus, shopping lists and recipes and after two weeks on the plan, my pressure stabilized. She did what the doctors were not able to do." tells the Court, "If I were limited to only a few words to describe Pat Adams they would simply be 'one of the best kind.'" Another friend, , writes in her letter that in 2015, when she was diagnosed with breast cancer and underwent intensive therapy, "[P]at was at my side throughout the whole ordeal. She sent a lymphatic masseur to my home once a week, for the entire duration of the chemo treatments." Adams would also purchase supplements for her at the health food stores and "cook special foods to try to entice my appetite." summarizes, "Throughout this grueling journey, Pat was the best friend anyone could have" and that "will never forget her generosity and compassion." When Tisha Amoruso Saffa's sister, , a 27-year New York City public school teacher, was battling metastatic breast cancer in the mid to late nineties, "Pat worked closely with the school administrators and students, initiating fundraising events to raise money for care. In addition to helping with the demands of her schoolwork, Pat took on the role of daily caretaker." Adams also took "to doctor's visits, managed her medicines coordinated her treatments, even accompanied her to Mexico for an experimental program that had been funded by her students." For all Adams efforts, surviving family members "remain eternally grateful." Yet another friend, recounts that when her husband was diagnosed with esophageal cancer, Adams "offered to research, assist and locate the finest doctors of oncology. She thoughtfully visited the health food store and brought him ginger and other natural items to alleviate the awful effects of chemotherapy." calls Adams "a special person".

The numerous people that have submitted letters to convey the Court many other accounts of Adams compassion and selflessness. For example, a friend of over thirty years, Joseph DeCandia, Jr., relates that when his wife's 93-year-old grandfather came to live his family, Adams helped with homecare decisions and created a strong relationship with the grandfather. One night, he had an incident in his bed, was in pain and would not listen to his nurse aide. They called Adams at 1:30 am, she ran over and to their house, "rolled up her sleeves and set to work,

---

[4] Ms. Adams will submit the original letter to the Court with her original, unredacted Sentencing Memorandum that will be hand delivered to the Court. She respectfully requests that after the sentencing proceeding that the Court permit her to retrieve the original document and replace it with a copy.

calming him, washing and cleaning him, all the while talking to him ... about how he was going to feel better very soon." Other instances include the caring for, and maintaining, a strong relationship with the children her brother abandoned at young age, playing a "pivotal role in helping raise [Joann Ariola's, her friend since 1972], sons" after Ms. Ariola became a single mother when the boys were in grade school, researching doctors and treatment for a friend's child that had contracted Lyme's Disease, tutoring her friend's children, guiding her stepdaughter through addiction and separation, demanding that her destitute brother-in law move in with her until he got back on his feet and providing free advertising to small businesses that are struggling.

The letters of support are replete with narratives demonstrating Adam's caring for others. However, no accounts are more demonstrative of her positive character than those about how she cares for her granddaughter and cared for her mother before her death. Because Adams' stepdaughter, Courtney Silverman, was not legally permitted to care for own child and the father of the child was incarcerated, Adams and her domestic partner, Theresa, assumed temporary custody of [redacted] (currently seven years old) for a two-year period when she was two or three years old. PSR ¶ 39. As Ms. Silverman describes, "My Mom and Pat became [redacted] legal guardians. She moved in with them and every week they had to go to classes at the foster parents place." Consequently, as Adams states in her letter, "She and I have a great bond which I could never describe." Theresa similarly relays, "This child loves Pat more than I have ever seen anyone love anyone." Even though they no longer have legal custody, [redacted] spends a great deal of time with her grandparents and has a room in their home. Adams helps her with her homework on a daily basis. PSR § 39. Erin Lynch, a principal in the New York City Department of Education writes, "Pat cares for her granddaughter [redacted] every day after school. When I visit Pat is either assisting with homework, helping her read more fluently or they are cooking together! Pat is an integral part of [redacted] daily life and academic development." Ms. Silverman has turned her life around and loves her daughter very much but she tells the Court, "[T]here is no one in [redacted] life that means more to her than what her Nan, that is what she calls Pat, means."

Last year, [redacted] was diagnosed with Attention Deficit and Hyperactivity Disorder. PSR § 39. Adams tells the Court that [redacted] "is on medication and the thought of that continuing shakes me to my core." After exhaustive research, defendant "located a treatment program at NYU that [she] believe[s] will turn a very difficult situation around." This treatment requires a therapy partner and, as Theresa tells the Court, "[T]he only one who can serve that role for [redacted] is Pat. That is because Pat is who she trusts not because I would not do it." Theresa further sincerely states, "For some grandmothers it might be difficult to admit that their granddaughter is more trusting of one grandmother over the other but for me it's a blessing to know that there is someone who can get our granddaughter through this." Adams believes, "I am truly the one who has her complete confidence."[5]

Defendant's older sister, Maryann Geary, tells the Court that the "thing [that] best

[5] In her letter, Defendant expressed a reluctance to bring this issue to the Court's attention but "thought it was such a critical point" that she was compelled to include it for the Court's information on her personal history and characteristics as they relate to [redacted]

defines [her] sister's character" is they way she cared for their parents in their advanced years. Linda Blum concurs and writes, "I don't think there is a better way to describe how unselfish Pat is then to go over how she took care of her mother for almost 10 years." Ms. Geary explains that the last ten years of their mother's life, eight of which she was bedridden, she lived with defendant due to her brother's long-ago abandonment of the family and Ms. Geary's poor health and distance away. She states, "This was not something she was 'assigned' to do; rather something she chose to do." Adams' niece, Samantha Geary, explains that of all the deeds she observed he aunt perform, "I think the most impactful will always be the care and treatment of my grandmother." She adds that Adams refused to put her grandmother in a home and "singlehandedly bore the hefty financial burden of the very expensive medical care and assistance my grandmother received for many years before she passed away." Maryann informs the Court, "Patricia sacrificed her time, her money and anything and everything else she needed to do to make sure our mother was cared for in a way very few elderly people experience." Samantha recalls Adams sitting "by my grandmother's bedside for hours on and caring for her, cooking her gourmet meals, telling her jokes, stories etc. She made sure my grandmother could still get her nails done, and her hair done right … so she would still feel like the amazing beautiful woman she was and not lose her dignity after being bedridden so long." Another grandchild, Jason Adams writes, "Although this may seem trivial, one thing I always remember during this time visiting grandma, her skin was always perfect. Never a sore, never a blemish, never a mark." Theresa reflects, "… I can tell you that what she did for her mom is something I have never heard of." Dr. Hershfeld offers a unique perspective as to Adams' care for her mother. The elder Adams was his patient as well. His impressions are poignantly set forth in his letter as follows:

> Over the course of my practice, I have seen and treated hundreds of elderly patients whose children were assigned the responsible [sic] of their parents care. Out of all those situations, this one remains as virtually the only one that is at the forefront of my recollections. I personally spent many hours with Pat, explaining the difficult challenges of caring for the elderly, especially when there were psychological components accompanied by onset dementia. Admittingly, I did suggest that perhaps residency in a facility should be a consideration. I remember vividly Pat's response. 'Doc, I love you dearly and I have the utmost respect for your opinion but I took my first breath in my mother's arms and she will take her last in mine.' The feelings I had for Pat were immediately amplified.

Joann Ariola similarly informs the Court, "As the years went by Ms. Adams suffered with many ailments including dementia and was no longer able to care for herself, it was Patricia that opened her home to her mother. Although some suggested, Patricia was against putting Ms. Adams in a nursing home and cared for many, many years until she passed."

All of these anecdotes provide the Court with the opportunity to learn Adams' true personal history and characteristics. She is woman of compassion and loyalty. A caregiver that will help friend or family member no matter how dire the situation. However, there is much more to Pat Adams. She cares deeply about her community and worked hard to make it better. If a

charity event was taking place in the that neighborhood or affected the community, Adams volunteered her time, used the Forum newspaper to provide free publicity or, in most instances, both.

Patricia McCabe, a woman that has known Adams for over fifty years, tells the Court, "In my work as chief of staff for an elected official I have personally witnessed her community dedication. She has worked on senior issues, veteran issues, school safety, the need for crossing guards. She has also volunteered and supported our many local charities." Gerard Connolly, a Howard Beach resident for sixty years, writes, "At nearly every community event, Pat is not only present and involved, she is either a central figure in the organization, and execution of the event, or she is the scribe that records the moment for the community." Mr. Connolly list the local VFW, the annual Memorial Day Parade, the Juvenile Diabetes Walk, the local Kiwanis and the SS Cosmos and Damiano Society as some of the charities Adams participated in and assisted. According to Ms. Napolitano, Adams "is a tremendous asset to the Howard Beach Community, and spearheaded the formation and development of the Howard Beach Columbus Day Foundation …" Mr. Fausilli recounts how he met Adams as a member of the Foundation. She eventually asked him to run the foundation and Adams stayed on as vice-president for the parade as it grew to the second largest Columbus Day parade in the country. In his letter, Mr. DeCandia, Jr. tells the Court that Adams donates free advertising to the SS Cosmos and Damiano Society, an organization of which he is the president, that "focuses on supporting our community, the preservation of the Italian culture, and fundraising to raise money for sick and terminally ill children." A particularly revealing testimonial comes from Phyllis Inserillo. She writes:

> I came to know Pat as the chairperson of the American Society Relay for Life that was being kicked off in Howard Beach. Pat heard about the event and reached out to me to see how she could help. She worked tirelessly with myself and my co-chair to help raise funds and was a big part in making our Relay the most successful the Borough of Queens has ever seen. Usually when you deal with newspaper publishers or business owners for events like this, they will give you a small sponsorship and send you on your way. That was not the case for Patricia Adams. She met with the survivors and caregivers, heard their stories, cried with them and laughed with them. Not just raising money but bringing the community together for a greater good. To this day, Pat is still as giving and involved in all of the community charity work and most importantly in mine."

Dr. Hershfeld recounts in his letter, "[Adams] efforts in this community have been tireless. I don't remember a single occasion when she came for an office visit and we did not talk about her latest project to make this community a better place."

News of defendant's arrest and the charged conduct quickly spread throughout the community Adams is profoundly ashamed of and her actions and humiliated by her status as a convicted criminal. Understandably, many members of the community look upon her differently now and even avoided making eye contact with her. However, many of the individuals and

charity leaders that Adams has helped in the past reached out to defendant and asked how they can help her now. Although Adams was initially reluctant to haver public involvement, after discussions with many individuals, she agreed to the idea of a petition and one was put together, circulated for submission to Court. The petition was signed by nearly 400 individuals[6] from the communities of Howard Beach, Ozone Park, South Ozone Park, Richmond Hill, Broad Channel and Woodhaven. These signatures represent individual support and the support of the many charities and organizations listed on the petition including the Howard Beach Assembly of God, the St. Barnabas Church, the St. Helen's Church, the Our Lady of Grace Church, the Ozone Howard Little League, Our Lady of Grace Soccer, the New York Families for Autistic Children, the Howard Beach Kiwanis, the Howard Beach Columbus Day Foundation, the Howard Beach/Lindenwood Civic Association, the Juvenile Diabetes Research Foundation, the Broad Channel Athletic Club and the Hamilton Beach Volunteer Ambulance and Fire Corps. The volume of the signatures is a testament to the many people Adams has touched and helped through her life and corroboration of her decency and valued personal characteristics.

Adams also provided assistance to her community, its members and charities through her work at the Forum newspaper. As her current editor, Michael Cusenza writes, "Before I walked into our Howard Beach newsroom, I wrote about Queens communities. By consistently putting her neighbors' concerns ahead of her own, and greater good at the forefront of the Forum's mission of public service, Pat Adams taught me how to write FOR [sic] the community – a distinction that has made a tangible difference in South Queens and my life." This communal emphasis resulted in Adams providing free advertising and publicizing articles about fundraising or community events and causes such as Helping Hands raising $25,000 for an ailing teen, a call for donations for the family of two year old that requires radical cancer treatment, announcing a memorial walk for a young woman that was murdered in the neighborhood to raise awareness, an event held to raise money for the family a volunteer fireman killed on duty, a Boys and Girls Club tasting event, the reward fund for an unsolved murder, a shoe drive to assist a local store to provide needy children with free shoes, a donation program to help families of opioid overdose victims, a walk for juvenile diabetes research, soliciting volunteers for graffiti cleanup programs, calling for volunteers for senior home assistance, requesting aid for library that had suffered severe budget cuts, helping disabled veterans apply for and receive benefits, calling for volunteers to paint a the Rockaway barrier, calling for a FVW Post's financial assistance, organizing a group for litter removal, volunteers to help with a local hospital's end of life program, calls for aid donations for Japan in a time of need and promoting the GoFundMe sites for several children that are suffering from cancer.[7] When the police was seeking the identity of person or sought the location of an individual suspected to be perpetrator of the crime, the Forum would write an informational article, post the person's picture and call upon the community for help.[8] Similarly, when a community member was missing, an article and picture would be published for assistance in locating that person.[9]

---

[6] Defendant expects to supplement this memorandum with additional signatures.
[7] A representation of these articles are attached as Exhibit D.
[8] A representation of these articles are attached as Exhibit E.
[9] A representation of these articles are attached as Exhibit F.

Adams also wrote articles to bring attention to community concerns regarding everything from dangers in the community to nuisance conditions. For example, Adams' investigative reporting and her paper's articles exposed a popular City Councilman that embezzled from the Ozone-Howard Little League, closed down a school that had toxic contamination, assisted the capture of an individual that participated in serial public lewdness, uncovering the deplorable conditions at a Salvation Army homeless shelter and unaccounted for funds, resulted in the cleaned up the yard of a "hoarder", eliminated the eyesore created by uncleaned U.S. Post Office mailboxes, stopped an abusive school bus company from unlawfully taking parking spots and clogging streets and forced the cleanup of an abandoned home and lot.[10]

Adams' greatest service to her community occurred in the aftermath of Hurricane Sandy. South Queens was devasted by the storm. The hurricane destroyed defendant's office and her home. However, this circumstance did not deter Adams for serving her community, As told by defendant's friend, Ms. Ariola:

> Most people were worried about their own situations, but not Patricia. She immediately reached out to another local paper and asked to use their offices to print the Forum News so that her community would have access to the latest information regarding services. She knew there was a need because there wasn't any access to television or radio at that time. People were scared and walking around dazed for days. For a time, the Forum News was the only way our residents were updated on recovery measures.

Her domestic partner, Theresa similarly describes, "Pat's mother, Evelyn, was bed bound and without power, much of the equipment we needed to keep her comfortable was unusable. But through the nightmare, Pat kept her head and found a facility where her mother could be moved and stay safe. At the same time, she knew the People needed information from the Forum and found a way to publish it within three days after the storm with no office, no staff and no equipment." The Forum provided information on what business were open, where to give and receive donations, the status of relief efforts, the heroic efforts of individuals, the status of mass transit and school closings and openings.[11] Mr. Connolly, a long Howard Beach resident recounts that the quickly published Forum, and the issues that followed, served as "the communication tool for an entire community during unbelievable chaos. James SanPhillipo writes, "While dealing with the effects of the storm, with both her home and her office devasted; Pat was able to publish the paper. Her articles and accounts were the beacon of hope during some of the most trying times anyone could imagine." In the one-year Sandy anniversary edition of the Forum, Assemblyman Phil Goldfeder placed an advertisement that read, "Thank you Pat Adams and the Forum for providing our community with essential news services needed to get through this

---

[10] These articles are attached as Exhibit G. Additionally, an article from the Daily News regarding the little league embezzlement is also included.

[11] Pictures of excerpts from these editions of the Forum are attached as Exhibit H.

difficult time."[12]

After the urgency of Sandy subsided, Adams continued to assist in the recovery. Mr. Connally report to the Court, "[Adams'] tireless efforts in working with City and Federal agencies and communicating to the entire region after Hurricane Sandy is a major effort that only those affected truly understand and appreciate" and that Adams' "physical, some would say ubiquitous, presence at the myriad of impromptu meetings with agencies immediately post Sandy was invaluable for the residents of Howard Beach, Broad Channel and the Rockaways." Dr. Antonio, a chiropractor that lives and works in Howard Beach, states, "After super-storm Sandy, when it seemed like this community was abandoned by the media and the city, Pat was at the forefront of bringing the extent of the devastation here to light. She advocated on behalf of many people who lost everything." Reverend Stephen A. Roser of the Howard Beach Assembly of God Church informs the Court, "[Adams] coverage of our flood-ravaged church following Superstorm Sandy helped generate funds for our rebuilding, while she took time to visit us although her own business facilities were also destroyed." As the holidays approached shortly after Sandy struck, "Patricia Adams worked with the Howard Beach Lindenwood Civic, of which I am the President, to set up supply locations within the storm affected area," according to Ms. Ariola. A turkey drive was established and Forum advertised free of charge that prepared and unprepared turkey dinners were available to the community. Additionally, as Ms. Ariola writes, "As Christmas approached, Patricia, once again, promoted a community event that distributed thousands of toys to families who may not have had anything under the tree for their children."

The Forum conducted town hall meetings and also published numerous informational and instructional articles regarding issues such as FEMA relief procedures, Small Business grant applications, the problems presented to seniors in the rebuild, fighting FEMA fraud, insurance claim review procedures, assistance available from local politicians. The Forum also warned of contractor fraud, kept citizens abreast of the recovery and aired the failings of government and complaints of the community members.

Adams does not contend that her dedication to family and friends or her service to her community in any way excuses her conduct. The insights within the letters are presented to assist the Court in determining Adams' true personal history and characteristics. Adams respectfully submits that her life's work of service to others is her personality, not the conduct that brings her before the Court for sentencing. These letters of support substantiate Adams' statement to the Court that, "Most importantly, I hope you can see that this was an isolated incident that is nowhere to be found in my past and one which certainly has no place in my future." She lives with the profound humility and the understanding that "a whole lifetime of good could be tainted by a single transgression." Additionally, as she explains to the Court, "The widespread devastation to my family, my friends and a community that has counted on my judgment, my honesty and my integrity over two decades is a weight that I will carry until I have no more breath." Defendant also knows that she caused harm to woman affected by her actions and "hurting her, or anyone else, is truly what makes me more ashamed of myself than of anything in my life." Adams

[12] A photograph of that advertisement is attached as Exhibit I.

respectfully submits that he personal history and characteristics are a sentencing factor that weighs heavily in favor of her receiving a non-incarceratoy sentence.

## CIRCUMSTANCES OF THE OFFENSE

Adams wants to be perfectly clear that regardless of the beliefs she held at the time she had the conversation with the father of the victim of the unlawful touching, her actions were unjustified, illegal and never should have occurred. Also, defendant is aware that a jury in Queens County convicted the defendant in that case of the misdemeanor of forcible touching and she respects that verdict. Adams does not refute the allegation as she sits here today. However, Adams respectfully submits that when she engaged in the discussion with the victim's father, she genuinely believed that the victim was not telling the truth about the incident. This belief was based on defendant's knowledge of a video recording of the victim's actions immediately following the incident and statements by other individuals and witnesses. Any person that views the video recording could reasonably draw the conclusion that the victim's conduct immediately following the incident is inconsistent with that of person that was a victim of sexual misconduct. Whether she was correct or not, Adams reasonably drew such a conclusion. Additionally, numerous eyewitnesses and historical witnesses provided information to defendant that led her to believe the incident did not occur. It was from that point of view that defendant engaged in the conversation

As a result, at the time she engaged in the conversation, Adams believed the underlying incident did not occur. During the recording, Adams thoroughly explained to the father why she believed the accusations to be false and detailed the contents of the video recording. She also stated that if she believed his daughter's accusations to be true, the story would say so and be about the perpetrator. This fact is offered to the Court only for the purpose of offering insight as to Adams' state of mind when she committed the offense. Again, defendant is in no way attempting to justify her actions.

## FACTUAL OBJECTIONS TO THE PSR

In paragraph 4 of the PSR, Probation stated that defendant is "associated" with the Bonanno family. "Associated" is a term of art that suggests Adams possessed some type of role or continuing relationship with Bonanno family. This characterization is entirely incorrect. Defendant did play cards at the club referenced in this paragraph (with many different types of people) and occasionally gambled on sports. She was friends with Robert Pisani and knew some of the other individuals on Mr. Pisani's indictment but was not in any "associated" with any people or crime family. In any event, Adams certainly did not have a business relationship with the Bonanno family.

Similarly, in paragraph 6, the PSR states, Throughout the meeting, Adams made it clear that she was acting on behalf of the Bonanno crime family." Defendant respectfully objects to this characterization and submits that the recording fails to support this assertion because it is

not accurate.

## CONCLUSION

For the above stated reasons, defendant Patricia Adams respectfully submits that a non-incarceratory sentence is reasonable and just under the sentencing factors set forth in 18 U.S.C. § 3553(a). Adams' exceptional record of public service and the service of others in need is a personal characteristic that justifies the requested sentence.

Thank you for Your Honor's consideration of this letter.

Very truly yours,

Sanford Talkin

Sanford Talkin

cc: AUSA Lindsay Gerdes (by ECF & email)